# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jamie C. Andrews,                          Civil No. 21-1449 (ECT/ECW)

        Plaintiff,

v.                                                     **ORDER**

Fairview Health Services,

        Defendant.

This matter is before the Court on Plaintiff's Motion and Amended Motion to Amend the Complaint (Dkts. 17 and 23) ("Motion to Amend"). For the reasons stated below, the Motion to Amend is denied.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

**A.    Plaintiff's Demand Letter**

On October 27, 2020, Plaintiff Jamie Andrews' ("Andrews" or "Plaintiff") legal counsel sent a settlement demand letter to Defendant Fairview Health Services ("Fairview" or "Defendant"). (Dkt. 31-4.) As part of the settlement demand, Andrews represented as follows:

> We see a compelling case of interference/retaliation and whistleblower retaliation. The the [sic] lead up to discharge; Ms. Andrews' supervisors made scant effort to hide their disdain for, her need for intermittent FMLA leave and exhibited clear signs they had designs on her job. Ms. Andrews objected, warning her supervisors in a meeting shortly before discharge that terminating her employment would violate her FMLA rights.

(Dkt. 31-4 at 3.) The letter further stated:

During the certification process and at the hospital Ms. Andrews reports that her supervisor, Ms. Moser, and her boss, a man named Charlie, pulled her into the office one day on or around the week after the Fourth of July. She arrived and asked if Charlie and Ms. Moser were about to fire her, because they had prepared a document listing a number of attendance issues in June.

Ms. Moser[1] preemptively objected, reporting to Charlie and Ms. Moser that she could not be disciplined or fired for the absences listed on the document since they were or would be covered by law under the FMLA.

\* \* \*

Approximately two weeks later, on July 22, Charlie and Ms. Moser again summoned Ms. Andrews to the office at about 11 a.m., more than halfway through her shift. At that time, they notified Ms. Andrews that her employment was being terminated for attendance policy violations—the cited bases included protected FMLA days. . . . Ms. Andrews objected—stating that she was protected by the FMLA.

(*Id.* at 10.)

The demand letter went on to assert that Andrews would prevail in court on legal claims including FMLA interference and retaliation, as well as prevail on a Minnesota Whistleblower Act claim "predicated on her report, directly to her managers, two weeks before her discharge that any penalty citing FMLA-protected days would be illegal." (*Id.* at 11.)

## B.   Operative Complaint

In the operative Complaint dated June 1, 2021, which was removed to federal court on June 21, 2021 (Dkt. 1), Andrews alleges in relevant part as follows:

Fairview hired Andrews in May 2018 to work as a phlebotomist in the lab at its M

---

[1]   The Court understands that the letter meant to say that Andrews, not Moser, preemptively objected.

Health Fairview St. John's Hospital in Maplewood, Minnesota ("St. John's Hospital"). (Dkt. 1-1 ¶ 4.)

Andrews' son suffers from serious health conditions requiring her to leave work for periods of time. (*Id.* ¶¶ 16-29.) Fairview verbally coached Plaintiff on attendance issues and had issued a write-up outlining the attendance concerns, warning Andrews that they were becoming excessive. (*Id.* ¶ 30.) Andrews informed Fairview that the reason she had attendance issues was related to her son's serious health condition. (*Id.* ¶ 31.)

On or about August 28, 2019, Fairview, through its former third-party benefits administrator, UNUM, confirmed Andrews' eligibility for intermittent leave under the Family Medical Leave Act ("FMLA") based upon a medical certification provided by her son's provider, and Fairview initially approved Andrews' use of FMLA intermittent leave for the time period beginning August 8, 2019 and ending February 7, 2020. (*Id.* ¶¶ 33-34.)

By June 2020, Andrews was still tending to the monthly, weekly, and daily challenges of caring for a child with significant disabilities, and absences or tardies accumulated from time to time between February 2020 and June 2020, which were allegedly unprotected by the FMLA due to the February 2020 lapse in coverage. (*Id.* ¶¶ 41-42.)

On June 9, 2020, Plaintiff's direct supervisor, Jamie Moser ("Moser"), issued a Final Written Advisement regarding attendance that in part cited to protected FMLA days among its justifications, and it became clear to Andrews that her FMLA coverage had lapsed. (*Id.* ¶¶ 43-44.) Andrews immediately obtained a provider's note relating to

absences during the first week of June 2020, gave it to Fairview, and contacted Cheryl Talbot ("Talbot") in Defendant's Absence Management division to clear up any clerical issues so that she would continue to have protection under the FMLA.  (*Id.* ¶¶ 45-46.) During the re-certification process, Talbot told Andrews to keep track of attendance issues that could be covered by FMLA, and Andrews did so and communicated them according to normal, established practice and procedures at St. John's Hospital.  (*Id.* ¶ 47.)

During this re-certification process, Andrews' supervisor, Moser, and Moser's boss, "Charlie," met with Andrews around the week following July 4, 2020.  (*Id.* ¶ 49.) When Andrews arrived at the meeting, she asked if Charlie and Moser were about to fire her, because they had prepared a document listing a number of attendance issues in June that she could see.  (*Id.*)  "Plaintiff preemptively objected, reporting to Charlie and Ms. Moser that she could not be disciplined or fired for the absences listed on the document since they were or would be covered by law under the FMLA."  (*Id.* ¶ 50.)  "Charlie glared at Ms. Moser, asking something like, 'is that true?' and Ms. Moser stayed silent. Charlie then looked to Plaintiff, rolled his eyes, threw his hands up, and ordered Plaintiff to return to work."  (*Id.* ¶ 51.)

On or about July 16, 2020, Defendant approved Andrews for renewed, intermittent FMLA protections and backdated the FMLA protections to June 3, 2020, lasting through June 2021.  (*Id.* ¶¶ 48, 52.)

On July 22, 2020, Charlie and Moser notified Plaintiff that her employment with Fairview was being terminated for attendance policy violations — of which the cited

4

bases included protected FMLA days.  (*Id.* ¶ 53.)

As part of the Complaint, Andrew asserts the following claims against Fairview: (1) an FMLA entitlement claim under 28 U.S.C. § 2601 *et seq.*; (2) an FMLA discrimination claim under 28 U.S.C. § 2601 *et seq*; (3) an FMLA retaliation claim under 28 U.S.C. § 2601 *et seq*; (4) a Minnesota Human Rights Act ("MHRA") reprisal – association with disabled person – claim; and (5) a sexual orientation discrimination claim under the MHRA.  (*Id.* ¶¶ 56-90.)  Andrews sought punitive damages in the Complaint for Fairview's alleged MHRA violations.  (*Id.* ¶¶ 84, 89.)

As part of her FMLA retaliation claim, Andrews alleges in relevant part as follows:

> Section 2615 of the FMLA also forbids employers from retaliating against employees who oppose any practice made unlawful under the FMLA. § 2615(a)(2).  *See also Pulczinski*, 691 F.3d at 1006.
>
> Plaintiff opposed practices made unlawful under the FMLA by, for example, pointing out that she should not be disciplined or discharged in connection with FMLA-protected absences during several meetings and conversations prior to her termination from employment.
>
> Defendant retaliated against Plaintiff following her oppositional acts by terminating her employment because of her oppositional acts.
>
> As a result of Defendant's wrongful conduct, Plaintiff has suffered and will continue to suffer damages including, but not limited to, past and present loss of income, future loss of income, lost benefits, out-of-pocket damages, and other harms compensable with money damages to be proven and awarded by the trier of fact.

(Dkt. 1-1 ¶¶ 74-77.)

**B.      Scheduling Orders in this Case**

On July 27, 2021, the Court issued its initial pretrial scheduling order in this case. (Dkt. 13.)  The Order provided that "all motions that seek to amend the pleadings or to add parties must be filed and served on or before **September 3, 2021**."  (*Id.* at 5 (emphasis in original).)  In addition, the Order provides that "[a]ll motions that seek to amend the pleadings to include punitive damages, if applicable, must be filed and served on or before **January 14, 2022**."  (*Id.*)  The Order also provided that the parties must commence fact discovery procedures in time to be completed on or before April 15, 2022.  (*Id.* at 3.)

**C.      Pertinent Discovery and Proposed Amendments**

On December 8, 2021, Andrews took the deposition of Moser.  During her deposition, Moser testified as follows.

> Q      So, it's the meeting in which Jamie Andrews' employment with Fairview Health Services was terminated?
>
> A      Yes.
>
> Q      So, that happened on July 22nd. Was it determined before this meeting started that Jamie would be fired at that meeting?
>
> MS. WEBER: Objection; foundation. You can answer.
>
> THE WITNESS: I don't think it was a final, final decision, but we had the paperwork ready if that's what the decision was made to do.
>
> BY MR. KWAN:
>
> Q      And the reason I asked is because this exhibit has the title "Investigatory Meeting with Jamie Andrews."
>
> A      Yeah.

Q      Which made me wonder if the outcome could have changed based on what happened in the meeting.

A      Yes.

MS. WEBER: Object to form.

BY MR. KWAN:

Q      So, is it your recollection that there is a possible outcome wherein Jamie Andrews would've kept her job coming out of this meeting?

A      Potentially, yes.

(Dkt. 26-1 at 16-17.)[2]

Andrews asserts that it is this testimony that prompted noticing the present motion, which was filed on December 14, 2021, and the Amended Motion with supporting materials in compliance with Local Rule 7.1 that was filed on January 13, 2022. (Dkt. 25 at 16-18.)

In particular, Andrews' proposed amended complaint seeks to add a Minnesota Whistleblower Act ("MWA") claim, Minn. Stat. § 181.932. (Dkt. 23-1 ¶¶ 139-49.) In support of this claim, Andrews alleges as follows:

Plaintiff reported reasonably and in good faith what she believed to be, among other legal violations arising out of Plaintiff's factual reports, actual, planned, or suspected violations of the FMLA.

For example, within minutes of Defendant's decision to terminate Plaintiff's employment on July 22, 2020, Plaintiff objected to and told Ms. Moser, Mr. Burridge, and Mr. Krueger facts implicating FMLA interference in the event

_____

[2]      Andrews also references the December 2021 deposition testimony from Moser and Talbot that Andrews claims show deliberate indifference by Moser to her FMLA rights prior to her termination in support of her entitlement to punitive damages under the MWA. (Dkt. 25 at 3.)

Plaintiff was fired for attendance issues that should have been protected by the FMLA.

Specifically, Plaintiff told Mr. Burridge, Ms. Moser, and Mr. Krueger that she must not be disciplined or fired in connection with FMLA-protected days.

After Plaintiff lodged her verbal report in the July 22nd meeting, Defendant decided to terminate her employment within minutes.

Defendant took such adverse action against Plaintiff because of her report ostensibly because it did not hear what it had wanted to hear from her—by terminating her employment citing attendance issues as the purported business justification, which Plaintiff believes was a pretext to cover up the MWA retaliation alleged herein.

The adverse employment actions alleged herein constitute violations of the MWA.

The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and to adversely affect her status as an employee and a person.

The unlawful employment practices complained of above were intentional and were performed by Defendant or its agents with malice and/or with reckless indifference to the MWA, which protects Plaintiff.

(*Id.* ¶¶ 141-48.)

The proposed amended complaint also seeks to add a claim for punitive damages under Minn. Stat. § 549.20 based on Defendant's deliberate disregard for her protected activity under the MWA when it decided to fire Plaintiff mere moments after she reported to Moser, Talbot, and Krueger that doing so would effectively be illegal under the FMLA.[3] (*Id.* ¶¶ 150-56.) Andrews' proposed amended complaint does not seek to add

---

[3]   In addition, Andrews seeks emotional distress damages as part of her MWA claim. (Dkt. 23-1 ¶ 149.)

any additional punitive damages under § 549.20 based on any other state claim.[4]

## II.      LEGAL STANDARD

Plaintiff's Motion to Amend is generally governed by Rules 15 and 16 of the Federal Rules of Civil Procedure and Local Rule 16.3 of the Local Rules for the District of Minnesota.

### A.      Rule 15

Federal Rule of Civil Procedure 15(a) provides that "[t]he court should freely give leave [to amend] when justice so requires."  The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court.  *See, e.g.*, *Niagara of Wisc. Paper Corp. v. Paper Indus. Union Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir. 1986) (citation omitted).  The Eighth Circuit has held that although amendment of a

---

[4]      Andrews intimated that the motion to amend relates to her claim for punitive damages under the MHRA, as she did not know what Defendant's position was in this regard.  Defendant conceded at the hearing that punitive damages had already been pleaded in the Complaint as to the MHRA (which are capped to no more than $25,000), and therefore were properly part of the case.  Indeed, the specific punitive damage provision in the MHRA displaces the requirements of Minn. Stat. § 549.191.  *See* Minn. Stat. § 363A.29, subd. 4; *see also Minn. Stat*. § 363A.33, subd. 6 ("If the court finds that the respondent has engaged in an unfair discriminatory practice, it shall issue an order directing appropriate relief as provided by section 363A.29, subdivisions 3 to 6."); *Zuniga Escamilla v. SMS Holdings Corp.*, No. CV 09-2120 (ADM/JSM), 2011 WL 13318238, at *13 (D. Minn. July 29, 2011), *aff'd,* No. CV 09-2120 ADM/JSM, 2011 WL 13318237 (D. Minn. Dec. 14, 2011).  "In other words, a plaintiff may plead a claim for punitive damages under the MHRA in her original complaint without complying with the motion requirements of Minn. Stat. § 549.191; however, if the party moves to add punitive damages after the Complaint, Rule 15(a) applies."  *Escamilla*, 2011 WL 13318238, at *13 (citations omitted).  As stated previously, the Complaint already seeks punitive damages as to Andrews' MHRA reprisal claim and MHRA sexual orientation discrimination claims.  (Dkt. 1-1 ¶¶ 84, 89.)  As such, the Court finds that punitive damages as to these claims has already been pled in this action and no further motion to amend is required.

pleading "should be allowed liberally to ensure that a case is decided on its merits . . . there is no absolute right to amend." *Ferguson v. Cape Girardeau Cty.*, 88 F.3d 647, 650-51 (8th Cir. 1996) (citing *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989); *Chesnut v. St. Louis Cty.*, 656 F.2d 343, 349 (8th Cir. 1981)).

Denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Hillesheim v. Myron's Cards and Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018) (citation omitted) ("A district court's denial of leave to amend a complaint may be justified if the amendment would be futile."). "Denial of a motion for leave to amend on the basis of futility means the district court has reached the legal conclusion that the amended [pleading] could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Accordingly, in reviewing a denial of leave to amend we ask whether the proposed amended [pleading] states a cause of action under the *Twombly* pleading standard . . . ." *Zutz v. Nelson*, 601 F.3d 842, 850-51 (8th Cir. 2010) (citation and marks omitted); *see also In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir. 2007) ("[W]hen a court denies leave to amend on the ground of futility, it means that the court reached a legal conclusion that the amended complaint could not withstand a Rule 12 motion.").

On a motion to dismiss filed pursuant to Rule 12(b)(6), the Court must take the well-pleaded allegations of a claim as true, and construe the pleading, and all reasonable inferences arising therefrom, most favorably to the pleader. *See Morton v. Becker*, 793

F.2d 185, 187 (8th Cir. 1986).  To survive a motion to dismiss, a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

### B.      Rule 16

Under Rule 15(a), leave to amend should be granted liberally, if "justice so requires."  However, the Eighth Circuit has held that when a party has filed a motion to amend the complaint after the deadline provided in a court's pretrial scheduling order, then the court may properly require, pursuant to Federal Rule of Civil Procedure 16(b), that good cause be shown for leave to file a pleading that is out of time with that order. *See Freeman v. Busch*, 349 F.3d 582, 589 (8th Cir. 2003) (citing *In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999)).  "If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure."  *In re Milk Prod. Antitrust Litig.*, 195 F.3d at 437-38 (citation omitted).

Scheduling orders pursuant to Rule 16(b)(1) "assure[ ] that at some point both the parties and the pleadings will be fixed . . . ."  Fed. R. Civ. P. 16(b), advisory committee's note to 1983 amendment.  Moreover, "Rule 16(b) assures that '[a] magistrate judge's scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly

disregarded . . . without peril.'" *Archer Daniels Midland v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 582 (D. Minn. 1999) (quoting *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D. Me. 1985)). Under Rule 16(b), "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Similarly, Local Rule 16.3 requires a party moving to modify a scheduling order to "establish good cause" for the proposed modification. Further, regarding the timing of when such a motion must be made, Local Rule 16.3(d) states, "[e]xcept in extraordinary circumstances, before the passing of a deadline that a party moves to modify, the party must obtain a hearing date on the party's motion to modify the scheduling order. The hearing itself may take place after the deadline."

"The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716-17 (8th Cir. 2008) (citing *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006)); *see also* Fed. R. Civ. P. 16(b), advisory committee's note to 1983 amendment ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."). "[T]he 'good cause' standard [of Rule 16(b)] is an exacting one, for it demands a demonstration that the existing schedule cannot be reasonably met despite the diligence of the party seeking the extension." *Scheidecker v. Arvig Enters.*, 193 F.R.D. 630, 632 (D. Minn. 2000) (citation omitted).

While the prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, the Court will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines.

*See Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001) (concluding that there was "no need to explore beyond the first criterion, [diligence,] because the record clearly demonstrate[d] that Bradford made only minimal efforts to satisfy the [scheduling order's] requirements"). In short, Rule 16(b) focuses on "the diligence of the party seeking to modify a Scheduling Order, as opposed to the litany of unpersuasive excuses, inclusive or inadvertence and neglect, which commonly undergird an untimely Motion to Amend." *Scheidecker*, 193 F.R.D. at 632 n.1 (citations omitted).

With these standards in mind, the Court turns to Plaintiff's Motion to Amend.

## III.   <u>ANALYSIS</u>

Fairview argues that the Motion to Amend should be denied because Andrews failed to establish the requisite good cause needed for bringing the motion after the deadline for such motions expired, as the evidence needed to bring an MWA claim had been in her possession since the initiation of her suit. (Dkt. 29 at 10-14.) With respect to Rule 15, Fairview asserts that Andrews' MWA claim is futile as the FMLA provides the exclusive remedy for the alleged retaliation. (Dkt. 29 at 18-22.) As to the proposed punitive damages claim, Fairview argues that the claim is futile because Andrews has failed to allege such liability against a principal as required by Minn. Stat. § 549.20, subd. 2; the claim for damages is preempted by the FMLA; and Plaintiff failed to plead sufficient facts to establish by clear and convincing evidence that Fairview acted with deliberate disregard for her MWA rights when it terminated her employment. (*Id.* at 26-41.)

A.      **Good Cause Analysis**

The gravamen of the proposed MWA claim is that Andrews was terminated on July 22 after her reports of "legal violations arising out of Plaintiff's factual reports, actual, planned, or suspected violations of the FMLA," one example of which was Andrews' statement to Fairview during the July 22 meeting that she must not be disciplined or fired in connection with FMLA-protected days.  (Dkt. 23-1 ¶¶ 141-146.) Although the operative Complaint does not assert an MWA claim, Andrews identified another instance in the Complaint where she made a similar report the week after July 4, during a meeting with Charlie and Moser, where she asked if they were about to fire her because they had prepared a document listing a number of attendance issues in June that she could see.  (Dkt. 1-1 ¶ 49.)  According to the operative Complaint, "Plaintiff preemptively objected, reporting to Charlie and Ms. Moser that she could not be disciplined or fired for the absences listed on the document since they were or would be covered by law under the FMLA."  (*Id.* ¶ 50.)  "Charlie glared at Ms. Moser, asking something like, 'is that true?' and Ms. Moser stayed silent.  Charlie then looked to Plaintiff, rolled his eyes, threw his hands up, and ordered Plaintiff to return to work."  (*Id.* ¶ 51.)  Plaintiff also asserted an FMLA retaliation claim in the operative Complaint based on the same type of statements she relies on for the proposed MWA claim, alleging that "Plaintiff opposed practices made unlawful under the FMLA by, for example, pointing out that she should not be disciplined or discharged in connection with FMLA-protected absences during several meetings and conversations prior to her termination from

employment" and "Defendant retaliated against Plaintiff following her oppositional acts by terminating her employment because of her oppositional acts." (Dkt. 1-1 ¶¶ 75-76.)

Andrews' proposed MWA claim focuses on (but is not limited to) the July 22 meeting and an allegation that Fairview decided to terminate her after Andrews "lodged her verbal report" during that July 22 meeting.[5] (Dkt. 23-1 ¶¶ 141-146.) But Andrews plainly had other information in her possession as of the date of the operative Complaint of other reports that would form the basis of her MWA claim, as she alleged that she "point[ed] out that she should not be disciplined or discharged in connection with FMLA-protected absences **during several meetings and conversations prior to her termination from employment**" in that Complaint. (Dkt. 1-1 ¶ 75 (emphasis added).) As one example, Andrews identified her report during the meeting with Charlie and Moser the week after July 4 as a basis for an MWA claim in her pre-suit settlement letter to Fairview. (Dkt. 31-4 at 10-11.) Andrews also asserted in that letter that she would be entitled to argue for punitive damages under the MWA, "as evinced by her managers'

---

[5]     The letter appears to describe a slightly different sequence of events, where Charlie and Moser "notified Ms. Andrews that her employment was being terminated for attendance policy violations—the cited bases included protected FMLA days," and then "Ms. Andrews objected—stating that she was protected by the FMLA. (Dkt. 31-4 at 10.) However, the Court notes that this has no bearing on this Court's decision given that Rule 408 prohibits admitting settlement communications for proving or disproving the viability of claim. *See Heimerl v. Tech Elec. of Minnesota, Inc.,* No. 12-CV-612 SRN/SER, 2013 WL 3353930, at *4 (D. Minn. July 3, 2013). Instead, the settlement communication is only being considered for the purposes of Plaintiff's knowledge of the MWA claim as part of this Court's good cause analysis. *See* Fed. R. Evid. 408(b) ("The court may admit this evidence for another purpose.").

deliberate disregard for her FMLA rights, which Ms. Andrews flagged desperately in the run-up to her illegal discharge."[6]  (*Id.* at 15 n.7.)

Andrews makes several arguments why she did not assert an MWA claim in her operative Complaint.  As to the settlement letter, she argued at the hearing that settlement letters often contain puffery and try to include every conceivable claim.  Given the specific conduct identified in the letter as a basis for an MWA claim (Andrews' meeting with Charlie and Moser the week after July 4), this argument does not persuade the Court.

Andrews also argued during the hearing that at the time of the Complaint she was unsure of the causation element regarding why Fairview terminated Andrews on July 22 and that it was not until Moser's deposition that Andrews learned that the decision to terminate her was not final before the July 22 meeting, and that the outcome of the July 22 meeting might have been different based on what happened during the meeting. Andrews' focus on the July 22 meeting ignores the fact that Andrews had identified the

---

[6]     The potential punitive damages available based on an MWA claim under Minn. Stat. §§ 549.191 and 549.20 are more generous than the capped damages available under the MHRA, and of course the FMLA does not allow for punitive damages.   *See* 29 U.S.C. § 2617(a).  A tactical decision not to allege an MWA claim in the operative Complaint based on a belief that there was no basis for punitive damages would not constitute good cause to amend to add the MWA claim at this time.  *See Morrison Enter., LLC v. Dravo Corp.*, 638 F.3d 594, 610-11 (8th Cir. 2011) (affirming district court's denial of motion for leave to amend on ground that a tactical choice not to pursue a claim earlier did not show diligence); *see also Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 09-cv-1091 (JNE/JSM), 2010 WL 4193076, at *7 (D. Minn. Oct. 7, 2010) ("A strategic decision at the beginning of the case to not allege a MUTPA claim, because Aviva did not believe it had a basis for punitive damages at that time, does not constitute good cause for seeking the amendment now.").

meeting with Charlie and Moser the week after July 4 as conduct giving rise to an MWA claim in her settlement letter. It also ignores the fact that the operative Complaint describes the meeting the week after July 4 in detail and alleges that Andrews was terminated in retaliation for her statements that "she should not be disciplined or discharged in connection with FMLA-protected absences **during several meetings and conversations prior to her termination from employment**." (Dkt. 1-1 ¶¶ 49-51, 75-76 (emphasis added).) While the evidence relating to the July 22 meeting may not have come to light until Moser's deposition, Andrews was in possession of other facts underlying her MWA claim long before she brought her motion to amend, and the "very close temporal proximity" of the meeting with Charlie and Moser the week after July 4 and her termination on July 22 could be "sufficient to establish the prima facie element of causation." *See Pelant v. Pinnacle Airlines, Inc.*, No. CIV. 05-1173 (PJS/RL), 2006 WL 2286381, at *5 (D. Minn. Aug. 8, 2006) (addressing Minn. Stat. § 181.932) (citations omitted). Indeed, Andrews apparently relied on that temporal proximity when asserting the FMLA retaliation claim in the operative Complaint, and there is no discernable reason why Andrews would believe she had sufficient basis to assert her FMLA retaliation claim (but not an MWA claim) at that time. Andrews' possession of much of the information underlying the proposed MWA claim weighs against a finding of good cause. *See Dolphin Kickboxing Co. v. FranChoice, Inc.*, No. 19-CV-1477 (MJD/ECW), 2020 WL 12849103, at *10 (D. Minn. Nov. 25, 2020) ("In sum, while some evidence may have been available after the January 18, 2020 cut-off for motions to amend, the key evidence on which Plaintiffs rely was available months before the motion to amend deadline

expired.  Consequently, the failure of Plaintiffs to move to amend for more than half a year (or to seek an extension of time to amend) demonstrates a lack of diligence incompatible with good cause under Rule 16."); *Moldex Metric, Inc. v. 3M Co.*, No. CV 14-1821 (JNE/FLN), 2016 WL 845264, at *2 (D. Minn. Mar. 4, 2016) ("Although documents were produced and depositions took place after July 1, a substantial portion of the evidence on which Moldex Metric relied to support its second motion was available to it months before July 1. . . . Its failure to [amend before July 1] do so reveals a lack of diligence that is incompatible with a finding of good cause.").

Andrews also argued at the hearing that she did not initially bring the MWA claim because she and her counsel wanted to carefully pick the strongest claim (so as to not confuse the Court or a jury), abide by Rule 11, and withstand a Rule 12 motion.  While the Court appreciates Plaintiff's desire to have strong evidence in her possession before bringing a cause of action, that is not what Rule 8, Rule 11, or Rule 12 requires, nor does that desire equate to good cause under Rule 16 to allow her to add the claim now.  If that was the case, then everyone would wait to bring the majority of their claims after discovery.  *See Schmidt Printing, Inc. v. Pitney Bowes, Inc.*, No. 10-1038 (JNE/TNL), 2011 WL 13262110, at *6 (D. Minn. Aug. 29, 2011) ("In support of its motion, Schmidt Printing contends that it did not move earlier because of the requirements of Fed. R. Civ. P. 9(b) and 11.  This argument is unpersuasive because the obligations under Fed. R. Civ. P. 9(b) and 11 do not operate independently of Fed. R. Civ. P. 16.  Rules 9(b), 11, and 16 present hurdles for all parties.  Thus, the burdens of Fed. R. Civ. P. 9(b) and 11 do not create "good cause" under Fed. R. Civ. P. 16.").

In sum, "[t]his lack of action [by Plaintiff] may be careless, inadvertent, strategic or due to other pressing matters, but it does not amount to the requisite due diligence needed to bring the present motion." *AGA Med.*, 2012 WL 12888665, at \*7.  For all of these reasons the Courts denies the Motion to Amend on Rule 16 grounds.

## B.      Futility Under Rule 15

Fairview also opposes the Motion to Amend on the grounds that the FMLA preempts the proposed MWA claim because the FMLA provides the exclusive remedy for FMLA violations.  (Dkt. 29 at 19-22.)  "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).  Courts have recognized the three types of preemption: express, field, and conflict preemption.  *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  Fairview argues that Andrews' MWA claim is preempted by FMLA under the doctrine of conflict preemption.  (Dkt. 36 at 2.)  "Conflict preemption occurs 'where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives." *Arc of Iowa v. Reynolds*, No. 21-3268, --- F.4th ---, 2022 WL 211215, at \*11 (8th Cir. Jan. 25, 2022) (quoting *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Pracs. Litig.*, 621 F.3d 781, 794 (8th Cir. 2010)).  At the hearing, Andrews cited to two cases that she claims counter Fairview's preemption argument: *Parten v. Consolidated Freightways Corp. of DE*, 923 F.2d 580 (8th Cir. 1991), and *Nelson v. Productive Alternatives, Inc.*, 715 N.W.2d 452 (715 N.W.2d 452 Minn. 2006), which the parties addressed in letters after the hearing as requested by the Court.  (Dkts. 36, 38.)

In *Parten*, the Eighth Circuit examined whether the MWA was preempted by the Surface Transportation Assistance Act ("STAA"), 49 U.S.C. § 31105. The STAA "provides comprehensive legislation over motor vehicles." *Parten*, 923 F.2d at 581. Under the STAA, an employee may not be discharged for filing a complaint or beginning a proceeding related to a violation of a commercial motor vehicle safety. 49 U.S.C. § 31105(a)-(b). Those who are retaliated against have the right to file a complaint with the Secretary of Labor asserting STAA violations and may seek compensatory damages, as well as punitive damages in a hearing before the Secretary of Labor. *Id.* In *Parten*, the plaintiff objected to practices he viewed as unsafe, was discharged, and chose not to file a complaint with the Secretary of Labor, choosing instead to bring a claim under the MWA for wrongful retaliatory discharge. *Parten*, 923 F.2d at 581-82. The employer argued that the STAA preempted the plaintiff's MWA claim because it stood as an "obstacle to the accomplishment" of Congress's purposes of protecting employees who report STAA violations. *Id.* at 583. With respect to conflict preemption, the Eighth Circuit found as follows:

> CF contends that Minnesota state law is an obstacle to the accomplishment of the full purpose of Congress. The Surface Transportation Assistance Act has two objectives according to CF. The first is protection of employees by prohibiting discharge if the employee files a complaint or objects to unsafe conditions in equipment. The second objective, according to CF, is the exclusive enforcement of safety through the Secretary of Labor who is to receive notice of any employee's complaint concerning discharge, discipline or discrimination.
>
> Minnesota's statute does not conflict with the goal of protection of employees who are discharged for objecting to unsafe conditions. The statute provides an additional remedy for the employee who is retaliated against. We

20

agree with the district court's assessment that the state remedy is a complementary remedy which does not conflict with section 405.

CF asserts that the state statute interferes with the uniformity of a national remedial scheme. CF contends that the complaint system through the Secretary of Labor enables quicker detection of potential safety problems. A similar argument was raised in *Silkwood*, 464 U.S. at 257, 104 S. Ct. at 626. There the Supreme Court found that the award of punitive damages pursuant to state law did not frustrate the purpose of the remedial scheme. *Id.* Likewise, subjecting an employer to both state and federal penalties for discharging an employee who refuses to violate a safety standard does not seem unreasonable. Although the Secretary of Labor may not have notice of all potential safety violations if employees are allowed to pursue state remedies, it seems too harsh to preclude an employee from seeking a state remedy for that reason alone.

**We agree with the district court that the language of section 2305, promulgated pursuant to section 405 of the STAA, does not suggest that it was intended to be the exclusive remedy for employees who blow the whistle on commercial motor vehicle operators.** Section 2305(a) offers protection for employees who have, "filed any complaint or instituted or caused to be instituted any proceeding" relating to the violation of a commercial motor vehicle safety rule. 49 U.S.C. App. § 2305(a). **The Secretary of Labor may defer to the outcome of other proceedings, on a case by case basis**. 29 C.F.R. § 1978.112.

We hold that Minnesota's statute is not preempted.

*Parten*, 923 F.2d at 583 (emphasis added).[7]

In this case, the FMLA remedy provision provides for a list of enumerated remedies such as lost wages, interest, liquidated damages, and certain equitable relief.

---

[7]     The Court agrees with Fairview that the Minnesota Supreme Court decision in *Nelson*, *supra*, is of no import since it addresses the MWA in the context with another state law claim, a state common-law wrongful discharge claim, as opposed to relief under a federal statute such as the FMLA.

*See* 29 U.S.C. § 2617(a).  Unlike the MWA and the STAA,[8] the FMLA does not authorize punitive damages or damages for emotional distress.  *See Rodgers v. City of Des Moines*, 435 F.3d 904, 909 (8th Cir. 2006) (citations omitted) (finding that the FMLA does not permit recovery for emotional distress damages); *Johnson v. Dollar Gen.*, 778 F. Supp. 2d 934, 951-52 (N.D. Iowa 2011) (quoting *Rensink v. Wells Dairy, Inc.*, 741 F. Supp. 2d 1038 (N.D. Iowa 2010) ("Remedies under the FMLA do not include punitive damages.  'Prohibited damages under the FMLA include emotional distress, nominal, consequential, and punitive damages.'").  In passing the Civil Rights Act of 1991, Congress provided for compensatory and punitive damages in both Title VII cases and American with Disabilities Act cases.  *See* 42 U.S.C. § 1981a.  However, two years later, Congress did not provide for punitive damages when it enacted the FMLA.  *See* 29 U.S.C. § 2617.  The United States Supreme Court has acknowledged that Congress restricted the scope of the remedial provisions of the FMLA: "We also find significant the many other limitations that Congress placed on the scope of this measure. . . .  [T]he cause of action under the FMLA is a restricted one: The damages recoverable are strictly defined and measured by actual monetary losses. . . ."  *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 738-40 (2003) citations omitted).  Unlike in the Eighth Circuit's *Parten* decision, where the court found there was nothing demonstrating that Congress intended the STAA to be the exclusive remedy for employees who blow the whistle on

---

[8]    The Court notes that along with punitive damages, emotional distress damages are allowed under the STAA.  *See Maverick Transp., LLC v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 739 F.3d 1149, 1157 (8th Cir. 2014), *as corrected* (Jan. 17, 2014).

commercial motor vehicle operators, given the narrow scope of compensatory damages authorized and intended by Congress as part of the remedial scheme for violations of the FMLA,[9] courts have concluded that allowing state law or other federal law remedies to rectify an FMLA violation would circumvent Congress' intent to make the specific remedies set forth in § 2617 the exclusive remedies available for an FMLA violation. Indeed, a majority of courts have held that the menu of remedies contained in the FMLA for violations of the Act is exclusive. *See*, *e.g.*, *Bynum v. Bandza*, No. 20-CV-2343, 2021 WL 6102525, at *8 (C.D. Ill. Nov. 5, 2021) ("Although there is no express preemption provision in the FMLA, [ ] the FMLA does provide a limited set of remedies. Most significantly, the remedies available under the FMLA do not include punitive damages or damages for emotional distress. Because Congress developed a remedial scheme under the FMLA that does not allow damages for emotional distress, if a plaintiff could bring an IIED claim based on conduct that was made unlawful by the FMLA, they could circumvent this exclusive remedial system that Congress created for FMLA violations. This would frustrate the entire purpose of developing an exclusive list of remedies.")

---

[9]     The Court notes that Plaintiff argues that the FMLA itself expressly contemplates complementary protections under state law. (Dkt. 38 at 2.) While the FMLA provides that it should not be "construed to supersede any provision of any State or local law that provides **greater family or medical leave rights** than the rights established under this Act or any amendment made by this Act," it provides no such carveout regarding state law remedies for violations of the Act, thereby undercutting Plaintiff's argument. *See* 29 U.S.C.A. § 2651(b) (emphasis added). Further, the Court rejects Plaintiff's argument that Congress must have intended broader remedies for FMLA violations via state causes of action merely because it expressly authorizes employers to provide more generous leave than that afforded by the Act. (Dkt. 38 at 2 (citing 29 U.S.C.A. § 2653).) Again, this only pertains to the scope of leave allowed and not the scope of damages.

(cleaned up); *Eilen v. Minneapolis Pub. Sch.*, No. 17CV04388 (ECT/DTS), 2019 WL 1557535, at *10 (D. Minn. Apr. 10, 2019) ("Insofar as Eilen's § 1983 claim against Ward is based on Ward's handling of her periods of FMLA leave, that claim must be brought under the FMLA, and cannot be converted into a constitutional claim to be litigated under § 1983.  *See*, *e.g.*, *Lucht v. Encompass Corp.*, 491 F. Supp. 2d 856, 866 (S.D. Iowa 2007) (concluding that the 'remedies provided by [29 U.S.C. § 2617] are the exclusive remedies for FMLA violations' and that claims amounting to FMLA discrimination may not be brought as state-law wrongful-discharge claims).") (parentheticals in original); *Eriksen v. Wal-Mart Assocs., Inc.*, No. CV14155 BLGSPWCSO, 2016 WL 697091, at *6 (D. Mont. Feb. 19, 2016), *R. & R. adopted sub nom.* , 2016 WL 1588498 (D. Mont. Apr. 19, 2016) (citations omitted) ("In finding conflict preemption with state statutes, these courts have reasoned that, while the FMLA does contain a savings clause that expressly allows states to provide greater rights for family and medical leave, it does not allow states to provide additional remedies for FMLA violations.  This Court has similarly found that allowing a claimant to bring a state law tort claim to rectify an FMLA violation, and thereby recover damages not recoverable under the FMLA, would circumvent the remedial scheme Congress devised to accomplish the FMLA's objectives."); *Kastor v. Cash Exp. of Tennessee*, LLC, 77 F. Supp. 3d 605, 614-15 (W.D. Ky. 2015) ("Congress developed a remedial scheme that does not allow damages for emotional distress.  If a plaintiff could bring an IIED claim based on conduct that was made unlawful by the FMLA, she could circumvent this exclusive remedial system that Congress created for FMLA violations.  This would frustrate the entire purpose of developing an exclusive list of remedies.");

*McAllister v. Quality Mobile X-Ray Servs., Inc.*, No. 3:12-CV-0078, 2012 WL 3042972, at *6 (M.D. Tenn. July 25, 2012) (same) (collecting cases); *Sturza v. Loadmaster Eng'g, Inc.*, No. CIV. A. H-07-2500, 2008 WL 1967102, at *3 (S.D. Tex. May 1, 2008) (collecting cases) ("At least the negligent misrepresentation claim seeks exemplary damages. . . .  If these claims are based on a violation of FMLA rights and Sturza prevails, he potentially could recover compensatory damages, including damages for emotional distress, as well as punitive damages.  Making those remedies available through a tort claim to rectify an FMLA violation would circumvent the 'specific remedies set forth in § 2617' as the exclusive remedies available for an FMLA violation."); *but see, Hunt v. Honda of Am. Mfg. Inc.*, No. C2-01-1188, 2002 WL 31409866, at *2 (S.D. Ohio Sept. 4, 2002) (holding that wrongful discharge claim was not preempted because the FMLA's savings clause, 29 U.S.C. § 2651(b), "reveals Congress' intent that the remedies available under the FMLA are not to be considered exclusive, and . . .federal law is not to preempt state claims.").

Andrews asserts that she is not seeking to add an MWA claim as a vehicle for additional remedies not prescribed by the FMLA, but is seeking to add an MWA claim as an entirely separate cause of action under state law that, while complementary, stands on its own.  (Dkt. 38 at 3.)  However, at the hearing, Andrews described the MWA claim as a "doorway" to the addition of a punitive damages claim and complements the FMLA by providing a greater remedy.  Given the plain language of the proposed amended complaint, the Court finds that Andrews' FMLA retaliation claim and the proposed MWA claim challenge the same conduct: retaliation against Andrews for opposing a

25

practice made unlawful under the FLMA.  (*Compare*, Dkt. 23-1 ¶¶ 122-24 *with* ¶¶ 140-44.)  Based on this, and given Congress' intent to limit damages for FMLA violations to compensatory damages, the Court finds that Andrews' MWA claim is futile for the purposes of Rule 15 on conflict preemption grounds since Plaintiff is seeking both emotional distress and punitive damages through the proposed MWA claim that are not permitted by the FMLA and that allowing her to add an MWA claim would serve as an obstacle to the Congressional objective of limiting remedies for violations of the FMLA to compensatory relief.  On this additional basis, the Court also finds that Plaintiff's punitive damages claim based solely on the MWA claim is futile and denies the Motion to Amend.

**V.    ORDER**

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT**

1.    Plaintiff's Motion to Amend the Complaint (Dkt. 17) is **DENIED**.

2.    Plaintiff's Amended Motion to Amend the Complaint (Dkts. 23) is **DENIED**.


Date: February 23, 2022            *s/ Elizabeth Cowan Wright*
                                   ELIZABETH COWAN WRIGHT
                                   United States Magistrate Judge